Argued and submitted September 30, 2004, remanded for resentencing as to costs of court-appointed counsel; otherwise affirmed April 13, appellant's petition for reconsideration filed April 15 allowed by opinion June 15, 2005

See 200 Or App 143 (2005)

STATE OF OREGON,
*Respondent,*

*v.*

JEFFREY SCOTT ROSS,
*Appellant.*

CM0021223; A115701

110 P3d 630

Anne Fujita Munsey, Deputy Public Defender, argued the cause for appellant. On the opening brief were David E. Groom, Acting Executive Director, and Ingrid A. MacFarlane, Senior Deputy Public Defender. With her on the second supplemental and reply briefs were Peter A. Ozanne, Executive Director, and Peter Gartlan, Chief Defender. On the supplemental brief was Eric M. Cumfer, Senior Deputy Public Defender, Office of Public Defense Services.

Katherine Waldo, Assistant Attorney General, argued the cause for respondent. With her on the briefs were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Wollheim and Schuman, Judges.

EDMONDS, P. J.

**EDMONDS, P. J.**

Defendant was convicted of seven counts of rape in the first degree, ORS 163.375, one count of unlawful sexual penetration in the first degree, ORS 163.411, five counts of sodomy in the first degree, ORS 163.405, six counts of using a child in a sexually explicit display, ORS 163.670, and seven counts of sexual abuse in the first degree, ORS 163.427. The state indicted defendant on 37 counts but withdrew some of the counts on its own motion. The jury eventually convicted defendant on all of the remaining counts. Defendant now appeals his conviction on those counts. We affirm defendant's convictions and remand for resentencing. ORS 138.222(5).

This case involves defendant's sexual abuse of his biological son, MR, his biological daughter, CR, and his step-daughter, MG, when the children were all between the ages of nine and 12. Defendant began a friendship with MG's mother, who was single, in 1994, and moved in with MG's family in October 1994. He married MG's mother in April 1995. At the time that defendant moved in with MG's family, he had custody of his son, MR. Soon thereafter, defendant gained custody of his daughter, CR, who had been in foster care for some time.

At the time that the abuse began, CR and MG, who were approximately the same age, were both 10 years of age. MR was one year younger than CR. The state offered evidence at trial that, on multiple occasions, defendant engaged in group sexual situations with the three children. The evidence also indicated that defendant had sexual intercourse and other sexual contact with CR when the two were alone, and that he had sexual intercourse with MG at least once, when he and MG were alone.

Defendant's sexual abuse of MG stopped in the middle of MG's sixth grade year, when MG refused to permit it. CR ran away from home in May 1996, and when the police found her she told them about the sexual activities. When MG and MR were questioned about CR's statements, both denied that any abuse had occurred. CR was removed from defendant's home and placed in foster care. MR also ran away from home and told a police officer about defendant's

abuse. Again, MG denied that any abuse had occurred. Then, in August 2000, MG went to the police to report she had been abused. MR, however, recanted his claims of abuse, and, at the time of trial, denied that any abuse had occurred. CR and MG testified to the abuse at trial.

■　　In his first assignment of error, defendant argues that the trial court erred in overruling his objection to the testimony of two of the state's expert witnesses, Dr. Sabin and Dr. Mussack. Defendant argues that the testimony of both witnesses "was not properly qualified as expert opinion evidence and thus was not relevant or a proper subject for expert testimony." Both witnesses testified about some of the common characteristics of children who have been sexually abused in familial situations. In particular, both witnesses testified that children in such situations often delay reporting and sometimes recant their stories of abuse, and they explained why those behaviors often occur. Neither witness rendered an opinion as to whether the victims in this case were victims of sexual abuse.

Defendant argues that the testimony of the two witnesses constituted scientific evidence and, therefore, under the Supreme Court's holdings in *State v. Brown*, 297 Or 404, 687 P2d 751 (1984), and *State v. O'Key*, 321 Or 285, 899 P2d 663 (1995), their testimony was inadmissible because it failed to satisfy the requirements for admissibility of scientific evidence set forth in those cases. The state concedes, and we agree, that the evidence in this case was scientific evidence. *See State v. Marrington*, 335 Or 555, 560, 567, 73 P3d 911 (2003) (expert's testimony that "delayed reporting is a predominant feature of disclosure in otherwise verified cases of child sexual abuse" is scientific evidence subject to the analysis set forth in *Brown* and *O'Key*). In substance, we understand the state to make two responses to defendant's argument on appeal. First, it asserts:

> "The focus of [defendant's objection at trial] was upon the potential inferences jurors might draw from the testimony rather than upon the reliability of the science underlying the substance of the expert's testimony about common behaviors of victims of sexual abuse. Now, on appeal, defendant abandons the 'comment-on-credibility' basis for his

objection and switches instead to an attack on the sufficiency of the foundation laid by the state for the evidence under *Brown*."

Alternatively, it argues that it did, in fact, lay a foundation at trial for the admissibility of the evidence under *Brown*. We agree with the state's initial argument and do not reach its alternative argument.

In *Brown*, the court was asked to determine the admissibility of the results of a polygraph examination, which it characterized as scientific evidence. In making that determination, the court considered first how courts had determined the admissibility of scientific evidence in the past. The court noted:

"The term 'scientific' as we use it in this opinion refers to evidence that draws its convincing force from some principle of science, mathematics and the like. Typically, but not necessarily, scientific evidence is presented by an expert witness who can explain data or test results and, if necessary, explain the scientific principles which are said to give the evidence its reliability or accuracy."

*Brown*, 297 Or at 407-08.

■ The court concluded that the proper test is whether the scientific evidence meets the admissibility constraints of OEC 401, OEC 702, and OEC 403. *Brown*, 297 Or at 408-09. The court explained:

"To determine the relevance or probative value of proffered scientific evidence under OEC 401 and OEC 702, the following seven factors are to be considered as guidelines:

"(1)   The technique's general acceptance in the field;

"(2)   The expert's qualifications and stature;

"(3)   The use which has been made of the technique;

"(4)   The potential rate of error;

"(5)   The existence of specialized literature;

"(6)   The novelty of the invention; and

"(7)   The extent to which the technique relies on the subjective interpretation of the expert."

*Id.* at 417. The court further held:

> "The existence or nonexistence of these factors may all enter into the court's final decision on admissibility * * *, but need not necessarily do so. What is important is not lockstep affirmative findings as to each factor, but analysis of each factor by the court in reaching its decision on the probative value of the evidence under OEC 401 and OEC 702."[1]

*Id.* (footnotes omitted).

■     On appeal, defendant assigns as error the trial court's failure to consider the seven factors listed in *Brown*. ORAP 5.45(1) provides, in part, "No matter claimed as error will be considered on appeal unless the claimed error was preserved in the lower court[.]" In *State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000), the court said, regarding the doctrine of preservation of error:

> "[A] party must provide the trial court with an explanation of his or her objection that is specific enough to ensure that the court can identify its alleged error with enough clarity to permit it to consider and correct the error immediately, if correction is warranted."

We therefore turn to the trial court record to determine if defendant preserved the claim of error that he now raises in his first assignment of error.

Before Sabin testified, defendant's counsel made the following objection:

> "It's my understanding at this time that the District Attorney's Office intends to offer expert testimony of Dr. Sabin. * * * I'm objecting to this testimony on the grounds of relevancy. It's my understanding that this report, her testimony is titled 'Medical Evaluation.' It's my understanding that it was done at the request of the District Attorney's Office in preparation for trial and for no medical reason. Therefore, for example, the hearsay exception that refers to the medical histories being an exception and being brought in for testimony because it's done in contemplation of

---

[1] Defendant argues that there are more factors to consider in *O'Key*. However, in *State v. Sampson*, 167 Or App 489, 500, 6 P3d 543, *rev den*, 331 Or 361 (2000), we said that the "*Brown* and pertinent [*O'Key*] factors overlap to some degree and boil down to the [seven factors in *Brown*]."

receiving medical treatment, I don't believe, for example, that that exception would apply because the social history that was taken in this case was not done in contemplation of medical treatment.

"In addition, I'd just argue general relevancy in this case because I believe in conformance with the District Attorney's opening statement that this expert is here to testify, improperly, on the *credibility of the two young lady witnesses* in this case[.] I believe that is improper for one witness to comment on the credibility of another witness and therefore I object to her testimony."

(Emphasis added.)

In response to defense counsel's objection, the prosecutor argued that the state did not intend to have Sabin comment directly on the credibility of any witness. The prosecutor also clarified why the state believed that Sabin should be allowed to testify about her mental health diagnosis of the two victims. The trial court expressed concern about allowing Sabin to testify to any mental health diagnoses of the two girls and allowed the prosecution to make an offer of proof of Sabin's testimony before ruling on defendant's objection. That offer of proof included testimony by Sabin about her professional qualifications, the nature of her medical practice, her experience in treating children who have been sexually abused, and about her opinions concerning the common characteristics shared by child victims of sex abuse and that there are generally accepted treatment methods for sexually abused children.

The prosecutor then asked Sabin what documents she had reviewed that specifically pertained to the two female victims and what mental health diagnosis she made with regard to one of the victims. Sabin also testified that one of the female victims told her specifics about defendant's contacts with her.

At the end of the offer of proof, defense counsel said:

"Well, I can make a couple of comments. I think we have a situation in which Dr. Sabin is being asked to provide specific information on two of the people who are named victims in this case who are making allegations. And then she's being asked to provide the jury with some general

information on things in general. I think that combining these two areas into one witness would provide improper reinforcement for the first part, that is the diagnosis specifically of these witnesses and the subsequent justification of their behavior on the stand as indicating that they are two compelling witnesses because obviously only an abused person would act this way and since she acted this way she must be abused and therefore telling the truth. *I think that's inappropriate credibility evidence.*"

(Emphasis added.) Defense counsel also objected to the expert's testimony about one of the victim's statements regarding the abuse and to any diagnosis by Sabin about the victims' mental health status.

Later, the prosecutor told the court that the state intended to call Mussack and another expert witness, Dr. Chervanak.[2] As to Chervanak, the prosecutor said:

"And she's also going to be talking about medical evidence of sexual abuse, what the different categories of proof are for a doctor and what the studies show in terms of the number of exams that are normal in cases where there have been convictions or admissions. And then she's going to be talking about her examination with [CR] and what she does when she hears a disclosure relating to siblings based on the research and her own training and experience when she hears an allegation from a sibling, what that usually tells her."

The court concluded that Chervanak's testimony was admissible:

"I think you are getting perilously close to a reversal in this case. And so I realize—and realizing I don't make the law, you know, I think I've got a pretty good feel for the law and when I read [*State v. Middleton*, 294 Or 427, 657 P2d 1215

---

[2] When it was Mussack's turn to testify, the prosecutor asked him similar "*Brown* foundation" questions to those she asked of Sabin. Mussack's responses with regard to the "*Brown* foundation" questions were similar to Sabin's, in that he testified that there were generally accepted treatment and mental health diagnosis methods in dealing with sexually abused children, that most therapists in the mental health community followed those treatment and diagnosis methods, that there was research done in that area, that there were literature and articles regarding those methods, and that he was familiar with the literature. He did not testify about the specific techniques used to treat sexually abused children or how to assess the common characteristics of sexually abused children.

(1983)] and some of those earlier cases and then I read some of the recent Court of Appeals cases * * *. My clerk did some research in some federal cases. And so I think that is an issue that is ripe for reversal. But it is an issue that I can't make the law. I mean the Court of Appeals says somebody can come in and say 'I've read the reports and in my opinion this person is the victim of sex abuse.' So you can offer it. I wouldn't if I were in your shoes, but you can offer it[.] * * *

"But in any event, here's what we're going to do. I'm going to put the legal basis, as I understand, because we've had several hearings, what I understand to be [defense counsel's] objections so we get them all laid out so we have a record on this issue. *But my understanding is that [defense counsel] has objected on the grounds of insufficient I guess foundation for we'll say in this case Dr. Mussack and Dr.—what's the other doctor's name?"*

(Emphasis added.)

After further colloquy with counsel, the trial court further defined the issues before it:

"Chervenak and Mussack. Just insufficient basis for proper foundation under the *Brown* rules of admissibility of expert testimony that the subject that they're going to be testifying to, the sex abuse that they're, that [CR] is a victim of, is a child abuse victim, is an impermissible area for expert testimony *and* that it's a comment on the credibility of the witness."

(Emphasis added.) The trial court then asked of defense counsel, "[A]ny other objections that you want to put on the record?" Defense counsel replied, articulating objections that are not the subject of issues on appeal.

For purposes of preservation of the issue whether the state laid an adequate foundation for scientific evidence, defendant emphasizes the trial court's statement, "But my understanding is that [defense counsel] has objected on the grounds of insufficient, I guess foundation for we'll say in this case Dr. Mussack and Dr.—what's the other doctor's name?" But we derive a different meaning from the transcript as a whole. When the trial court's statements are read together in their context, it is apparent that the court was trying to identify what issues were before it. It ultimately defined two

issues that defendant had raised: (1) whether a foundation had been laid for Mussack and Sabin to testify that the children were victims of sex abuse, and (2) whether the experts' testimony would constitute an impermissible comment on the credibility of the victims. Our review of the transcript indicates that Mussack and Sabin never testified that the children were victims of sex abuse. Moreover, the trial court record demonstrates that at no time during the trial did defendant argue to the trial court that the testimony of Sabin or Mussack was inadmissible because their testimony failed to meet the admissibility requirements found in the seven-step analysis in *Brown*.

In addition, at no time did defendant take issue in his objections with the techniques or processes used to determine the common characteristics of sexually abused children. Defendant points to a colloquy with the trial court in which the court stated, "and there's also an issue about the *Brown* issue which even though the questions are asked doesn't resolve that issue." But that statement was made as the trial court and counsel were discussing whether the state's expert witnesses were impermissibly commenting on the credibility of CR and MG, a concern that they discussed on multiple occasions. It is unclear from the record exactly what the trial court was referring to when it mentioned *Brown* from time to time, but what is evident is that defendant never clearly put the trial court on notice that it should consider whether the evidence in question satisfied the seven factors of *Brown* for the admissibility of scientific evidence under OEC 401 and OEC 702.

■ In *State v. Stevens*, 328 Or 116, 122, 970 P2d 215 (1998), the court elaborated on what is required to preserve error in a trial court:

"[F]or purposes of preserving error, it is essential to raise the relevant issue at trial, but less important to make a specific argument or identify a specific legal source with respect to the issue raised. Although that principle imparts some degree of liberality to the preservation requirement, it does not transform that requirement into a cursory search for some common thread, however remote, between an issue on appeal and a position that was advanced at trial. Instead, in considering whether an objection at trial raised

the 'issue' being advanced on appeal, an appellate court must view the facts in light of the purposes of fairness and efficiency that underlie the requirement."

(Citation omitted.) The issue in *Stevens* was similar to the issue raised by defendant in this appeal. There, the state offered the testimony of an expert witness who testified that she had diagnosed one of the state's witnesses as having "Battered Woman Syndrome" (BWS). In an offer of proof, the witness testified as to her method of diagnosing BWS and that her diagnostic method was accepted by the psychological community. *Id.* at 122-23. At trial, the defendant argued that the evidence was merely profile evidence, that it impermissibly commented on a witness's credibility, and that the expert was not qualified to make a BWS diagnosis. *Id.* at 123. On appeal, the defendant argued that the testimony was "not 'relevant' or 'helpful' to the trier of fact under the framework for considering the admissibility of scientific evidence set out in [*Brown*.]" *Id.* at 121. But the Supreme Court refused to consider the issue on appeal, holding that the defendant had "raised no *issue* * * * regarding the admissibility of [the expert's] testimony as scientific evidence." *Id.* at 123 (emphasis in original).

Whether defendant's first assignment of error was preserved in the trial court is controlled by the reasoning in *Stevens*. Defendant argues on appeal that the trial court failed to consider the scientific evidence under the factors listed in *Brown*. However, as in *Stevens*, defendant never made that argument to the trial court. Defendant never argued below that there was a problem with the experts' testimony because the technique used in assessing the common characteristics of sexually abused children was scientifically invalid. Also, defendant never argued that the trial court had not sufficiently considered the technique in question under the seven factors set forth in *Brown*. Defendant's failure to raise the specific issue below that he now raises to us deprived the trial court of the opportunity to evaluate the state's offer of proof in light of *Brown* and to correct any error in its ruling. We conclude therefore that defendant has not adequately preserved the issue that he raises in his first assignment of error, and we decline to consider it further.

■     Defendant also raises various assignments of error pertaining to his sentences, including the trial court's imposition of consecutive sentences pursuant to ORS 137.123(5)(a),[3] on 10 of defendant's convictions. He also assigns error to the trial court's disallowance of consideration for otherwise available sentence modification programs under ORS 137.750[4] on 11 of his sentences. He argues that both the imposition of consecutive sentences and the disallowance of consideration for sentence modifications are based on findings that were not made by a jury and therefore are unconstitutional under *Blakely v. Washington*, 542 US 296, 124 S Ct 2531, 159 L Ed 2d 403 (2004), and *Apprendi v. New Jersey*, 530 US 466, 120 S Ct 2348, 147 L Ed 2d 435 (2000). Defendant concedes that he did not raise the above issues at trial but contends, nevertheless, that we should consider his arguments as "error apparent on the face of the record[.]" ORAP 5.45(6). However, we recently addressed and rejected similar arguments in *State v. Fuerte-Coria*, 196 Or App 170, 172-73, 100 P3d 773 (2004), *rev den*, 338 Or 16 (2005), and *State v. Vigil*, 197 Or App 407, 106 P3d 656 (2005). For the reasons expressed in those cases, defendant's arguments are unpreserved, and we do not address them.

---

[3] ORS 137.123(5) provides:

"The court has discretion to impose consecutive terms of imprisonment for separate convictions arising out of a continuous and uninterrupted course of conduct only if the court finds:

"(a) That the criminal offense for which a consecutive sentence is contemplated was not merely an incidental violation of a separate statutory provision in the course of the commission of a more serious crime but rather was an indication of defendant's willingness to commit more than one criminal offense; or

"(b) The criminal offense for which a consecutive sentence is contemplated caused or created a risk of causing greater or qualitatively different loss, injury or harm to the victim or caused or created a risk of causing loss, injury or harm to a different victim than was caused or threatened by the other offense or offenses committed during a continuous and uninterrupted course of conduct."

[4] ORS 137.750 provides, in part:

"(1) When a court sentences a defendant to a term of incarceration upon conviction of a crime, the court shall order on the record in open court as part of the sentence imposed that the defendant may be considered by the executing or releasing authority for any form of temporary leave from custody, reduction in sentence, work release, alternative incarceration program or program of conditional or supervised release authorized by law for which the defendant is otherwise eligible at the time of sentencing, unless the court finds on the record in open court substantial and compelling reasons to order that the defendant not be considered for such leave, release or programs."

■       Defendant's final assignment of error is that the trial court "erred in ordering defendant to pay a money judgment in the amount of $29,720."[5] The trial court ordered defendant to pay compensatory fines to each of the three victims in the amount of $7,500. It also ordered him to repay the cost of his court-appointed attorney in the amount of $3,000 and to pay unitary assessments of $605 each on two of the rape convictions and $105 each on the remaining 24 convictions. Defendant argues that the trial court erred in failing to consider his ability to pay when it imposed those judgments. We consider each of the fines separately.

At the sentencing hearing and after first determining the length of incarceration imposed, the trial court turned to the issue of the compensatory fines and court costs. It first ordered defendant to pay the above-mentioned compensatory fines, and then it imposed the judgment for attorney fees. At that point, counsel for defendant objected "on the grounds of presumed inability to pay from the length of the incarceration in which the Court has imposed." After some discussion about other matters, the trial court stated that "the Court noted your objection to the [imposition of compensatory] fines based on the fact that given his lack of work history and his length of incarceration that he would not be able to pay those." Later, counsel for defendant again objected to the fines, based on a claim that defendant will be incarcerated for the rest of his life.

The trial court was authorized to impose compensatory fines under ORS 137.101(1):

> "Whenever the court imposes a fine as penalty for the commission of a crime resulting in injury for which the person injured by the act constituting the crime has a remedy by civil action, * * * the court may order that the defendant pay any portion of the fine separately to the clerk of the court as compensatory fines in the case. The clerk shall pay over to the injured victim or victims, as directed in the court's order, moneys paid to the court as compensatory fines under this subsection. This section shall be liberally construed in favor of victims."

---

[5] We calculate the fines as adding up to $29,230.

Additionally, ORS 161.645 governs, in general, the court's authority to impose fines. It provides:

> "In determining whether to impose a fine and its amount, the court shall *consider*:
>
> "(1)   The financial resources of the defendant and the burden that payment of a fine will impose, with due regard to the other obligations of the defendant; and
>
> "(2)   The ability of the defendant to pay a fine on an installment basis or on other conditions to be fixed by the court."

(Emphasis added.)

The record as a whole also indicates that the trial court was aware that defendant could be incarcerated for the rest of his life and that defendant, arguably, had a "lack of work history." However, there is also evidence in the record that defendant owned a wood cutting business and at least one vehicle. In light of all of the facts, it is apparent from the trial court's remarks that it "considered" defendant's claim of his inability to pay the judgments imposed. In sum, the record demonstrates that the trial court complied with the requirement of ORS 161.645 that it consider defendant's ability to pay. We also review the amounts awarded for an abuse of discretion, *State v. Qualey*, 138 Or App 74, 77, 906 P2d 835 (1995), and conclude, based on the above record, that the trial court's awards were within the range of its authority under ORS 137.101(1).

■   Defendant next argues that the trial court erred in ordering him to pay court-appointed attorney fees. ORS 161.665. At the time that defendant was sentenced, ORS 161.665(3) (1999) provided:

> "The court shall not sentence a defendant to pay costs under this section unless the defendant is or may be able to pay them. In determining the amount and method of payment of costs, the court shall take account of the financial resources of the defendant and the nature of the burden that payment of costs will impose."

Also, ORS 161.675(1) provides, in part:

> "If a defendant is sentenced to a term of imprisonment, any part of the sentence that requires the payment of a sum of money for any purpose is enforceable during the period of imprisonment if the court expressly finds that the defendant has assets to pay all or part of the amounts ordered."

*See also State v. Wetzel*, 94 Or App 426, 429, 765 P2d 835 (1988) (before imposing the cost of appointed counsel, the court must find the present ability to pay). In this case, the trial court made no findings with respect to defendant's present ability to pay as the statutes required. Consequently, the trial court erred.

Finally, defendant argues that the trial court erred in ordering the unitary assessments under ORS 137.290 (1999) because it failed to consider his ability to pay as required by ORS 137.290 (1999).[6] In *State v. Sanchez*, 160 Or App 182, 189, 981 P2d 361, *rev den*, 329 Or 318 (1999), we said, "[ORS 137.290] does not impose an affirmative obligation on the trial court to make any particular findings as a predicate to imposing the assessment in the first place." For the reasons expressed above, we are persuaded that the trial court considered defendant's ability to pay, and, therefore, no abuse of discretion occurred.

Remanded for resentencing as to costs of court-appointed counsel; otherwise affirmed.

---

[6] ORS 137.290 (1999) provided, in part:

"(1) In all cases of conviction for the commission of a crime * * * the trial court * * * shall impose upon the defendant, in addition to any other monetary obligation imposed, a unitary assessment under this section. * * * The unitary assessment is a penal obligation in the nature of a fine and shall be in an amount as follows:

"(a) $105 in the case of a felony."